IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWSON PRODUCTS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>ANGELA HULSE,<br><br>    Defendant. | Case No. 24cv3561 |

# COMPLAINT

The Plaintiff, Lawson Products, Inc. ("Lawson"), submits its *Complaint* against Defendant, Angela Hulse, and alleges as follows:

## Parties

1. Lawson is a corporation organized under the laws of the State of Illinois. It maintains its principal place of business in Chicago, Illinois.

2. Angela Hulse is a citizen of the State of Nebraska and currently resides at 515 University Street, Hastings, Nebraska. Hulse is a former Lawson employee.

## Jurisdiction and Venue

3. The Court has diversity subject-matter jurisdiction under 28 U.S.C. § 1332. The Plaintiff is a citizen of the State of Illinois, and the Defendant is a citizen of the State of Nebraska. The amount in controversy exceeds $75,000, exclusive of interest and costs, because the damages incurred by Lawson as a result of the Defendants' breach of a customer nonsolicitation covenant in her Loyalty and Confidentiality Agreement

("LCA") exceeds the Court's jurisdictional minimum. A true and correct copy of the LCA entered into between Lawson and Hulse is attached as *Exhibit 1*.

4. The Court has personal jurisdiction over Hulse because she consented to jurisdiction in Illinois under Section 6 of the LCA and waived her right to contest personal jurisdiction in Illinois. (Ex. 1, § 6).

5. Venue is proper here because Hulse agreed to exclusive venue in either state or federal court in Cook County, Illinois. (Ex. 1, § 6).

## Factual Background

*Overview of Lawson's Business*

6. Lawson sells and distributes various products and services to the industrial, commercial, institutional, and governmental maintenance, repair, and operations marketplace. This is generally known within the industry as the "MRO Market."

7. Lawson's customers operate in a wide range of industries, including automotive repair, commercial vehicle maintenance, government, manufacturing, food processing, distribution, construction, oil and gas services, mining, and others.

8. The type of MRO products Lawson sells and distributes include fastening systems, cutting tools, chemicals, welding products, abrasives, and other related products.

9. Lawson sells and distributes these MRO products primarily through employee sales representatives, known as "ESRs."

10. Lawson's ESRs sign, as a condition of employment, an LCA with Lawson. (Ex. 1).

11. Each Lawson ESR operates in a geographic territory, with counties identified in a

Sales Territory Addendum to the LCA.

12. ESRs are responsible for cultivating business relationships, acquiring new customers, expanding sales with existing customers, servicing accounts, and safeguarding valuable customer information.

13. This customer information includes, for instance, sales order history, pricing detail, key contact information, and other data about a customer's needs, preferences, and buying habits.

14. A Lawson ESR also benefits from account exclusivity. That is, an ESR who establishes a business relationship with a customer has the sole opportunity to do business with that customer and earn commission income from sales procured for it.

15. This account exclusivity provides a mutual benefit to Lawson and its ESR. The ESR can create a close, personal connection with customers in his or her territory and thus earn incentive commissions. Lawson, in turn, knows that its sales are more likely to grow as the ESR gains a better understanding of customer needs and develops a relationship designed to secure repeat business.

16. To this end, a substantial majority of Lawson's sales come from repeat, long-term customers who entrust Lawson to service their MRO product needs regularly.

17. Lawson's ESRs do not just sell MRO products at a customer location, or simply ensure that a customer's product bins contain enough inventory. Rather, the Lawson ESRs learn the technical know-how not only to make certain that Lawson's customers have the correct product mix, but also to ensure that the customer has the complete understanding of product functionality.

18. Through training and ESR development, Lawson has expended substantial time, money, and effort in maintaining close and continuing business relationships and goodwill with customers.

19. These relationships and earned goodwill provide Lawson with a significant competitive advantage in the MRO Market and constitute valuable company assets.

*Hulse's Employment with Lawson and the Loyalty and Confidentiality Agreement*

20. Hulse began work as a Lawson ESR on August 29, 2012. She signed the LCA the same day.

21. Before becoming a Lawson ESR, Hulse worked as an independent contractor sales agent with Lawson's Drummond America division.

22. Hulse's assigned territory under the LCA included the Nebraska counties of Hall, Hamilton, York, Seward, Adams, Clay, Fillmore, Saline, Webster, Nuckolls, Thayer, Jefferson, Merrick, Nance, Platte, Howard, Polk, Buffalo, Kearney, Phelps, Custer, and Dawson. These counties are referred to as the "Relevant Territory." (Ex. 1, Sales Territory Addendum).

23. The LCA contains reasonable and adequate consideration, as recited in both Section 1.1 and Exhibit A. (Ex. 1). Hulso also remained continuously employed with Lawson for more than ten years after signing the LCA, with such continued employment constituting sufficient consideration for the LCA's business protection covenants.

24. Upon information and belief, Hulse signed the LCA without objecting to any of the terms and without trying to negotiate any of the contract's covenants.

4

25. The LCA contains a post-termination customer nonsolicitation covenant in Section 3.3, which states

> Employee agrees that for a period of eighteen (18) months following the end of Employee's employment with Company, Employee will not directly or indirectly interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (a) stop or reduce doing business with Company, or (b) buy a Conflicting Product or Service, unless a duly authorized Company officer gives Employee written authorization to do so. Employee agrees that direct interference includes, for example, selling a Conflicting Product or Service to a Covered Customer, or soliciting such a sale. Employee agrees that indirect interference includes, for example, (x) sales management or account management responsibility for a Covered Customer where another person or entity has direct solicitation or sales responsibility, and/or (y) acting in concert with another person or entity to sell a Conflicting Product or Service to a Covered Customer, or to solicit such a sale. The parties agree this restriction is inherently reasonable because it is limited to the places or locations where the Covered Customer is doing business at the time.

(Ex. 1, § 3.3).

26. Section 3.1 of the LCA defines the terms "Covered Customer" and "Conflicting Product or Service." (Ex. 1, § 3.1).

27. The term "Covered Customer" means

> …any one of the following: (i) a current customer of Company with which Employee has developed a business relationship or had substantial business contact as a result of Employee's employment with Company; (ii) a customer of Company to which Company has made sales in the twelve (12) month period preceding the end of Employee's employment with Company, and for which Employee was a point of contact; (iii) a prospective customer of Company,

> where Employee has been actively discussing, on behalf of Company, a potential business relationship, in the twelve (12) month period preceding the end of Employee's employment with Company; or (iv) a customer of Company about which Employee has received, used or accessed Confidential Information. References to the end of Employee's employment in this Agreement refer to the end, whether by resignation or termination, and without regard for the reason employment ended.

(Ex. 1, § 3.1(a)).

28. Under the LCA, "Conflicting Product or Service" means

> …a product and/or service that is the same or similar in function or purpose to a Company product and/or service, such that it would replace or compete with: (i) a product and/or service Company provides to its customers; or (ii) a product or service that is under development or planning by Company but not yet provided to customers and regarding which Employee was provided Confidential Information in the course of employment.

(Ex. 1, § 3.1(b)).

29. The customer nonsolicitation covenant in Section 3.3 is an essential feature of the LCA. The covenant serves as the foundation for Lawson's willingness to employ an ESR like Hulse, to grant her the exclusivity to manage accounts, and to vest her with the responsibility for developing customer relationships.

30. Section 3.3 is carefully—and narrowly—designed to protect Lawson's business relationships with the very customers that Hulse solicited and sold to during the time closest to the end of her Lawson employment.

*Hulse's Sales Role at Lawson*

31. To maintain a strong business relationship with customers, Lawson ESRs—

6

including Hulse—routinely support the sales process by assisting customers with inventory replenishment needs, organizing and maintaining product bins and cabinets, and providing technical expertise on Lawson products.

32. Because of the account exclusivity Lawson provided Hulse, she was the key point of contact for customers to which she sold MRO products.

33. By virtue of this arrangement, Hulse was able to develop close relationships with Lawson's customers, understand their purchasing needs, and earn their trust.

34. Through access to Lawson's information technology systems, Hulse also had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about Lawson's products and services.

35. Hulse's full access to this customer information allowed her to facilitate the procurement of orders for, and sales of, Lawson's MRO products and to better service the customers for which she was the principal Lawson contact.

36. Hulse's access to this type of customer information was solely for her use on behalf of Lawson and allowed her to develop customer goodwill, which is crucial to the sales process.

37. During the last full year of her Lawson employment (2022), Hulse had a book of business of nearly $600,000.

38. For the first seven months of 2023, Hulse was on pace for far greater annualized sales. That is, her production level from January through July 2023 exceeded $460,000.

*Hulse's Resignation and Her Subsequent Work with Winzer*

39. Hulse voluntarily resigned from Lawson effective July 31, 2023.

40. After resigning, Hulse did not cooperate in transitioning any accounts to Lawson.

41. Since resigning from Lawson, Hulse has solicited orders for, or sold, MRO products to several of her Covered Customers under the LCA on behalf of Winzer Corporation. Winzer is a Texas-based industrial supply company and a direct MRO competitor of Lawson.

42. The Covered Customers to which Hulse has solicited or to which she has sold MRO products since joining Winzer include Buffalo County Shop (Hulse's largest Lawson account), US Meat Animal Research, D&H Truck and Auto Parts, Kearney Public Schools, Bobcat of North Platte, and Nebraska Department of Roads.

43. Lawson discovered Hulse's sales activity with her Lawson Covered Customers by accident. That is, Lawson received a Winzer invoice to US Meat Animal Research dated August 10, 2023 with Hulse listed as the salesperson. A true and correct copy of this Winzer Invoice is attached as *Exhibit 2*.

44. The products Winzer and Hulse sold to US Meat Animal Research, reflected in the Winzer Invoice, are MRO products competitive with those Lawson offers to its customers.

45. In addition to the Winzer Invoice sent to US Meat Animal Research, Lawson also received by accident a quote from Kearney Public Schools in April 2024. This was intended for Hulse at Winzer. Instead, it arrived at Hulse's former Lawson email address.

46. Upon review of the pricing that Hulse proposed, Lawson learned Hulse had not

8

placed Kearney Public Schools on a more favorable government pricing program while employed with Lawson. Instead, Hulse used her pricing discretion as a Lawson sales employee to charge Kearney Public Schools higher tier pricing.

47. When Hulse solicited Kearney Public Schools on Winzer's behalf, she tried to make it appear that Lawson's pricing was non-competitive. But any pricing disparity stemmed directly from a pricing judgment Hulse herself had made.

48. Lawson also learned from another Covered Customer under the Hulse LCA that Hulse stated that Lawson was no longer going to work with small companies, which was untrue.

49. Upon information and belief, Hulse continues to solicit and sell MRO products to the vast majority of Covered Customers under her LCA besides those identified in paragraph 42.

50. Upon further information and belief, the MRO products that Hulse has sold to these Covered Customers are similar in function and purpose to the MRO products she sold to them on behalf of Lawson and thus constitute "Conflicting Products or Services" under Section 3.1(b) of the LCA.

### First Claim for Relief – Breach of Contract [Section 3.3 of LCA]

51. Lawson incorporates the allegations in paragraphs 1-50 as though pleaded in this Paragraph 51.

52. The LCA is a valid, binding contract between Lawson and Hulse, fully supported by adequate consideration.

53. Section 3.3 is a valid and enforceable post-termination restraint. The non-

solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Hulse had access during her last twelve months of employment.

54. Section 3.3 of the LCA is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill—not competition *per se*—for a limited time.

55. The covenant poses no undue hardship on Hulse, and the enforcement of Section 3.3 of the LCA will serve the public interest.

56. Hulse has breached, and continues to breach, Section 3.3 of the LCA by selling and/or soliciting orders for MRO products from the same Covered Customers to which she sold similar products during the last year of her employment with Lawson.

57. Hulse's solicitation of these customers has been for Conflicting Products or Services (as defined in the LCA), or those similar in function and purpose, to those offered for sale by Lawson during the one-year period before Hulse's voluntary resignation from Lawson.

58. Hulse has engaged in extensive sales and solicitation efforts in violation of Section 3.3 of the LCA on behalf of Winzer, a director competitor of Lawson for the supply of MRO products.

59. Lawson has complied with, and performed its obligations under, the LCA.

60. Lawson has a legitimate and protectable business interest in continuing to develop customers which Hulse solicited and sold to for Lawson during the one-year period before Hulse's voluntary departure as a Lawson ESR.

61. As a result of Hulse's conduct, Lawson has incurred damages in an amount to be

proven at trial.

## Request for Relief

The Plaintiff, Lawson Products, Inc., respectfully requests that the Court grant it the following relief:

(a) An accounting of all sales, commissions, and profits which Hulse has generated as a result of sales procured in violation of Section 3.3 of the Loyalty and Confidentiality Agreement;

(b) An award of compensatory damages to be proven at trial;

(c) An award of court costs and attorneys' fees as part of any judgment, as provided for in Section 5 of the Loyalty and Confidentiality Agreement; and

(d) Any other relief the Court deems just and appropriate under the circumstances.

Dated: May 2, 2024

                                                Respectfully submitted,

                                                LAWSON PRODUCTS, INC.

                                                By: */s/ Kenneth J. Vanko*
                                                          One of Its Attorneys

Kenneth J. Vanko (ARDC#6244048)
Clingen Callow & McLean, LLC
2300 Cabot Drive, Ste. 500
Lisle, Illinois 60532
(630) 871-2609
vanko@ccmlawyer.com